KENNETH POE AND MYRTLE L. POE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Poe v. Commissioner
Docket No. 24150-81.
United States Tax Court
T.C. Memo 1985-178; 1985 Tax Ct. Memo LEXIS 454; 49 T.C.M. (CCH) 1215; T.C.M. (RIA) 85178; April 9, 1985. Royal B. Martin, Jr.,Steven S. Brown, for the petitioners. Judy Jacobs, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioners' Federal *455 income tax as follows: Additions to Tax
Year
Deficiency
Section 6653(b) [1]
1971
$646.08
$323.04
1972
2,365.25
1,182.63
1973
1,739.21
869.60
1974
2,774.20
1,387.10
1975
6,279.01
3.139.51
After concessions, the issues for decision are: (1) whether certain checks received by Kenneth Poe from Dyer Auto Auction during the years 1971 through 1975 constitute taxable income; (2) whether Kenneth Poe [2] is liable for additions to tax under section 6653 (b); and (3) whether the statute of limitations bars any assessment for the years 1971 through 1974. [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein *456 by reference. During the years under consideration and at the time their petition was filed, Kenneth Poe and Myrtle L Poe were married and resided in Sycamore, Illinois. For the years 1971 through 1975, they timely filed joint income tax returns with the Internal Revenue Service Center in Kansas City, Missouri. The formal education of Kenneth Poe (who is hereinafter referred to as petitioner in the singular) ended in 1935 upon his graduation from a small high school in Surprise, Nebraska, a city with a population of about 200. He was subsequently employed in several menial jobs including farm laborer, service station employee, factory worker, and used salesman. He also served in the United States Air Force from 1942 to 1945 when he was honorably discharged. In the Air Force he was a communications lineman. After his discharge from the Air Force he sold new and used cars for several different firms until 1964 when he was employed by State Street Motors, Inc. first as a salesman then as sales manager and finally in about 1970 both as general manager and sales manager. State Street Motors is located in Sycamore, Illinois, is wholly owned by Sideny Katz, and during the time Mr. *457 Poe was general manager (1971-1979) had a substantial increase in both sales and net income Up to date of the trial of this matter petitioner had never taken any course or held any job which involved bookkeeping or accounting and he had never personally prepared an income tax return. Petitioners were married in 1950 and thereafter until the date of trial they had a joint checking account and joint savings accounts but almost all of their record keeping and financial matters were handled by Mrs. Poe. For instance, in the 33 years of their marriage he had written a total of about 12 checks. She saw to it that her husband's salary checks were properly deposited or cashed and from these checks she usually gave him a spending allowance of approximately $100 per month. For about 28 or 29 years prior to the date of trial Mrs. Poe had also maintained a personal diary in which she made contemporaneous entries of events occurring in or affecting their daily lives. During 1971 through 1975, the years in issue, Mr. Poe's responsibilities as both the general manager and the sales manager of State Street Motors included the disposition of some of State Street's used cars through automobile *458 auctions. He used Dyer Auto Auction extensively for this purpose. Dyer was owned by Rey Clark, a close friend of petitioner, and was located in Dyer, Indiana, about 99 miles from Sycamore. Two other auto auctions, The Arena and The Greater Chicago Auction, were located within 15 minutes of Dyer and charged competitive fees, but these auctions were seldom if ever used by petitioner. Dyer is a wholesale auction operated exclusively for car dealers. During one of its typical days automobiles are processed simultaneously through three different auction rings where they are sold to the highest bidders. At Dyer each car is assigned a number which determines the ring in which the car appears and the order of its appearance. As a general rule these numbers are issued on a first come, first served basis as the cars are brought in and registered with the auction. However, regular and favored customers, such as petitioner, could obtain numbers prior to the date of sale by calling the auction office ahead of time. Such preregistration was desired by sellers because it permitted them to preselect cars to be offered at the auction. It also allowed them to time the offering of their cars for *459 the period during which the greatest number of buyers would be present. About two or three times a month during the years under consideration petitioner selected cars from State Street's lot which were not "moving" and sold them through Dyer Auction. Petitioner was responsible for all transactions with respect to such cars, including the selection of the cars to be auctioned, the arrangements with Dyer, and the accounting for the cars and the proceeds received from their sale. During 1971 through 1975 petitioner received 55 checks from Dyer Auction in the following annual amounts: Year
Amount of Checks
1971
$ 500
1972
3,065
1973
1,750
1974
3,120
1975
2,750
$11,185
The above checks represented part of the proceeds received from the sale of some of the cars owned by State Street and sold by petitioner through Dyer. The checks varied in amounts from a low of $75 to a high of $600 and averaged about $203. The checks were issued by office employees of Dyer at petitioner's request and were made payable to him. All of the checks were endorsed and cashed by petitioner on or near their date of issue either at Dyer Auction or at The Log, a nearby restaurant-bar, *460 which was a regular meeting place for many of the dealers and other persons associated with Dyer, including some of its employees. The funds represented by the above checks were not reported on the income tax returns of petitioners for 1971 through 1975 and neither Mrs. Poe nor Mr. Katz had any knowledge of such checks until after petitioner learned in December of 1976 that respondent's agent was aware of them. At or about that time petitioner told his wife of the checks and advised Mr. Katz that he had cashed the checks and used their proceeds to provide drinks, food, and other entertainment to dealers attending the auctions at Dyer, to employees of Dyer Auction, and to other business associates of State Street Motors. At the same time petitioner also told Mr. Katz (1) that taking the checks "was a mistake", [4] (2) that he was sorry he had done so, and (3) that he would reimburse State Street if Mr. Katz desired. No reimbursement occurred, however, and petitioner continued in the employ of State Street until June or July of 1979, a period of about two and a half years. *461 Petitioner did not maintain a daily log or other contemporaneous record of the expenditures made by him from the Dyer checks or of any other expense paid by him on behalf of his employer. On their returns for 1971 through 1975 petitioners, however, claimed deductions for employee business expenses as follows: Year
Description
Amount
1971
None
None
1972
None
None
1973
Dinners
$1,125.00
for/with clients
1974
Dinners
$1,746.17
for/with clients
Motel Expense
$ 535.00
(out-of-town trips)
$2,281.17
1975
Dinners
$1,756.81
for/with clients
Lodging & Hotel
$ 565.00
$2,321.81
The above deductions were based upon estimates made by petitioner from memory at the time the returns were being prepared. When these figures were furnished by petitioner to his return preparer, he believed that they were an accurate indication of the amount of his own funds which he had spent on business entertainment. During the years in issue, State Street had a petty cash fund from which employees could draw money for business expenses. Occasionally petitioner took $15 or $20 from this fund to pay for tolls or lunches while traveling to or attending *462 auto auctions. During 1971 through 1975 petitioner received a monthly salary from State Street. He also received bonus checks on the dates and in the amounts shown below: Date of Check
Amount
January 12, 1971
$ 2,380.36
January 28, 1972
$ 5,158.90
August 30, 1972 *
1,000.00
$ 6,158.90
January, 1973
$12,457.29
December 4, 1973 *
1,200.00
$13,657.29
January 17, 1974
$19,108.24
December 17, 1974 *
1,000.00
$20,108.24
January 18, 1975
$16,681.52
State Street did not give petitioner a Form 1099 for any of the bonus checks. With the exception of the check for $12,457.29 issued in 1973 none of the bonus checks were included in the Forms W-2 which were issued by State Street to petitioner. The Forms W-2 which he received from State Street reflected his total compensation for each year by Stat Street as follows: Year
Amount
1971
$14,400
1972
14,752
1973
30,609
1974
19,200
1975
$19,200
$98,161
On their income tax returns for 1971 through 1975 petitioners reported all of the income shown on the Forms W-2 including the bonus of $12,457.29 received *463 by Mr. Poe in January of 1973. In addition, they reported on their 1974 return the bonus of $19,108.24 which was received by him on January 17, 1974 and for 1975 they filed a timely Declaration of Estimated Tax and paid the $4,400 of income tax which they estimated would be due for 1975 as a result of the bonus of $16,681.52 received by Mr. Poe on January 18, 1975. However, when the 1975 return was filed in April of 1976, it did not include the $16,681.52 bonus and as a result part or all of the estimated payments for 1975 were refunded by respondent to petitioners. The record contains conflicting evidence as to why the bonus was omitted from the 1975 return. This return, as well as the Declaration of Estimated Tax for 1975 and all other returns of petitioners back to 1964, was prepared by Fred Gibbs or some member of his office. Although Mr. Gibbs was not a licensed accountant or an enrolled agent with the Internal Revenue Service, during the years under consideration he operated an office which prepared annually about 600 income tax returns. He usually had about 6 or 8 employees. At the trial, Gibbs testified that the bonus received by Mr. Poe in January of 1975 was omitted *464 from the 1975 return because during the preparation of the 1975 return on April 5, 1976, petitioners stated that no bonus was received by Mr. Poe in 1975. Petitioners, however, testified that on April 5, 1976 an unidentified employee in Mr. Gibbs' office told them that it was not necessary to include the bonus on the 1975 return because it had already been declared on the 1975 estimate and the tax due with respect thereto had already been paid. They further testified that Mr. Gibbs was asked by them about the advice which they had received from his employee on the same date and that they continued to question the return for several days after it was prepared because of the omission of the bonus, but that after being assured by Mr. Gibbs on more than one occasion that the employee was correct, they filed the return. Mrs. Poe, however, made a contemporaneous notation in her diary to the effect that for the year 1975 they would receive a refund of over $5,000 because "the fellow who figured our tax said we paid it last year or overpaid or something." During the years 1971 through 1975 petitioners did not keep a record of the salary and/or the bonus checks received by Mr. Poe from *465 State Street. However, all of the bonus checks were deposited in savings accounts in their name at banks in the area in which they lived except the check for $5,158.90 received in January of 1972 and the check for $1,000 received in August of 1972. The check for $5,158.90 was used by the petitioners to purchase a certificate of deposit in their name at one of the same banks. The check for $1,000 was used to buy appliances for their home. The interest income from petitioners' savings accounts was reported by petitioners and was accepted without change by respondent during the investigation and in the statutory notice. Respondent's agent also admitted that his investigation failed to reveal that any part of the funds received by petitioner from Dyer Auction was spent by epetitioner for any purpose other than to buy food, drink and other items of entertainment for persons associated with Dyer and other establishments doing business with State Street. In 1976 respondent's agents commenced a criminal investigation of petitioners' income tax returns for 1971 through 1975. On December 2, 1976 Mr. Poe was interviewed by Special Agent Stephen L. Quisenberry in the presence of Debra *466 Kerwin, another employee of the respondent. In his memorandum of the interview which was prepared shortly thereafter, Mr. Quisenberry noted that while Mr. Poe was not represented during the interview and was advised at the commencement thereof that he had a constitutional right to remain silent and to consult with an attorney, Mr. Poe agreed to and did answer numerous questions. In the seven page memorandum the special agent also stated as follows: In response to questions asked by me, POE related the following: * * * The returns were prepared by J. FRED GIBBS. * * * The source of information as to income and deductions contained in these returns was forms W-2, cancelled checks, and documents maintained by his wife. He believes that all the information appearing in these returns are true and correct. That these returns show all the income received by him or his wife during the years 1971 to 1975, inclusive. That approximately $100 or more of "our of pocket" expenses he incurred may not be shown on these returns. * * * He maintains joint checking and savings accounts at the National Bank & Trust of Sycamore, a checking account at the First National Bank of DeKalb *467 and a joint savings account and home mortgage at DeKalb Savings and Loan. The source of funds deposited in the bank accounts was from income from State Street Motors and "C.D.'s" purchased from the National Bank & Trust of Sycamore. * * * Neither he nor his wife have made any investments or acquired any assets since January 1, 1971 which have not been discussed during the interview. Neither he nor his wife have received any income from any sources during the years 1971 to 1975, inclusive, which have not been discussed during the interview. * * * He agreed to allow an examination of his records at any time. He received no additional bonuses or prizes from the auto dealership which were not reported on his returns for the years in question. * * * He has never received any monies from an auto auction for the sale of a car which belonged to the dealership where he worked. * * * At this point in the interview, POE expressed his concern as to what specifically was wrong with the way his return was prepared. Once again I reminded POE that he should be aware of the Constitutional Rights Statement read to him at the outset of the interview. POE stated he fully understood *468 them. I then informed POE that we have evidence indicating that he received substantial amounts of unreported income from one, and possibly more, auto auctions during the years under investigation. I then asked POE if he had any comments. POE stated that he would like to speak to his attorney before answering any further questions. We told POE that that was his privilege. At this point the interview was terminated. Respondent terminated the criminal investigation without any prosecution and on September 8, 1981 mailed the notice of deficiency to petitioners. OPINION (1) Unreported Income
Petitioners have conceded that all of the bonus checks received by petitioner during 1971 through 1975 represent unreported income except the check for $12,457.29 in 1973 and the check for $19,108.24 in 1974. Furthermore, respondent has conceded that these two checks do not represent unreported income. With these concessions, the issue of unreported income is limited to the monies which petitioner admits he received from Dyer Auction. With respect to this issue petitioners first contend that the funds received from Dyer never belonged to Mr. Poe but instead belonged to State *469 Street Motors and were spent by Mr. Poe as general manager of State Street for State Street purposes. In other words, they argue that the funds represented income to State Street from the sale of cars and that such income was offset by deductible expenditures by State Street. Compare ; . Petitioners, however, ignore the uncontroverted fact that during the years under consideration State Street was unaware of the checks and of the income represented thereby and the expenditures made therefrom. Therefore, State Street could not have authorized the diversion of the funds or any expenditure made therefrom by Mr. Poe. In effect, petitioners contend that for the purpose of receiving and expending this portion of State Street's gross income, Mr. Poe was an agent of State Street although State Street as his principal was not aware of such agency or of the activity performed by Mr. Poe. Petitioners, however, have not furnished us with any authority for such a secret agency and we are not aware of any. Furthermore, the record as a whole clearly establishes *470 that Mr. Poe received the funds without any authority from State Street and spent them without restriction as he saw fit. Under these circumstances, the funds represent income for which he is responsible. See ; . Petitioners, however, further contend that if the funds received from Dyer constituted income to Mr. Poe, he is entitled to an offsetting deduction since he spent all of such income for the benefit of his employer. In an attempt to corroborate his testimony on this point, petitioners produced four witnesses who testified that during the years under consideration they observed Mr. Poe spending considerable sums of money at the Log Restaurant and elsewhere to entertain employees of Dyer and dealers who purchased cars at Dyer's auctions as well as other persons who did business with Mr. Poe and/or State Street. While this testimony tended in a general way to corroborate Mr. Poe's testimony that funds were spent for such purposes, the testimony of these four witnesses was vague and indefinite as to amounts and dates. In other words, *471 from the forthright and credible testimony of Mr. Poe as corroborated by these four witnesses, we are satisfied that Mr. Poe spent funds entertaining employees of Dyer and other business associates of State Street and that such expenditures were for the benefit of State Street. From this record, however, we are unable to find as a fact the amount so spent in any one year. Consequently, while we conclude that the receipt of such funds constituted income to Mr. Poe, we are unable to find the amount of the offsetting deduction to which he is entitled in any year. (2) Fraud
In the notice of deficiency respondent determined that all or part of the underpayment of tax required to be shown on petitioners' returns for each of the years 1971 through 1975 is due to fraud on the part of Kenneth Poe and that he was liable for the 50 percent addition to tax as provided by section 6653(b). Respondent has the burden of proof with respect to fraud.Section 7454(a); Rule 142(b). To satisfy his burden, respondent must establish with clear and convincing evidence that with respect to each year M. Poe intended to evade the payment of some part of the tax which he knew to be due by conduct *472 intended by him to conceal, mislead or otherwise prevent the collection of such tax. , supplemental opinion ; ; . Respondent contends that he has met his burden on this issue by proof of the following: (1) petitioners' repeated failure to report as income the checks received by Kenneth Poe from Dyer Auction; (2) petitioners' repeated failure to report all of the bonuses received by Kenneth Poe from State Street; and (3) petitioners' attempt to conceal the above omissions by making false statements to Special Agent Quisenberry. With respect to the Dyer checks, Mr. Poe testified that in or about 1971 he came to the conclusion either from conversations with Mr. Clark, the owner of Dyer Auction, or otherwise that it would be necessary for him to spend money entertaining dealers and others in order to successfully dispose of State Street's used cars at Dyer Auction; that while he believed this to be true at the same time he realized that Sidney Katz, the owner of State Street, *473 would not authorize such expenditures; that he took the Dyer checks in order to have the funds needed to make the expenditures for State Street; and that he spent all of the funds represented by the Dyer checks for such purposes. As noted, we found Mr. Poe to be a forthright and credible witness. When all the surrounding circumstances, including especially Mr. Poe's limited education, his lack of experience in bookkeeping, accounting and the handling of funds, are taken into consideration, we are satisfied that respondent has failed to establish that Mr. Poe knew that the Dyer checks represented income to him either at the time the returns were filed or during the interview with Mr. Quisenberry. With respect to the bonus checks, Mr. Poe testified that until respondent's investigation of his returns he was under the impression that all of the bonus checks prior to the one dated January 17, 1974 for $19,108.24 were included in the compensation shown on the Forms W-2 which were given to him by State Street. In fact, this was true with respect to the bonus check in the amount of $12,457.29 which had been included in his W-2 for 1973. Furthermore, the bonus paid in 1971 was only $2,380.36 *474 which was considerably less than, and could have been easily included in, the $14,400 shown on his W-2 for that year. However, in 1972, his bonuses totaled $6,158.90 which represented nearly 50 percent of the $14,752 shown on his W-2 for that year and in our opinion would have been more difficult to overlook. On the other hand, the bonus check of $16,681.52, which was received by Mr. Poe in January of 1975, was reported to respondent during 1975 on an estimate prepared by Mr. Gibbs, and according to the testimony of petitioners they were repeatedly assured by Mr. Gibbs and one of his employees that this bonus check was correctly handled on the 1975 return. Since Mr. Gibbs, who is familiar with tax returns and their preparation, was admittedly aware of the bonus for at least a year before preparing the final return for 1975, and since he had both the estimate and the final return including its Form W-2 in his office when the final return was prepared, we are unable to understand why he would prepare and release the 1975 return to petitioners without including the bonus therein even though, as he testified, petitioners were claiming that no bonus was received in 1975. Under the *475 circumstances the explanation made by the petitioners as to how the omission occurred is more logical and worthy of belief than that made by Mr. Gibbs. In any event their reporting of the bonus to Mr. Gibbs in 1975, their filing of the timely estimate prepared by him with respondent in 1975, and their payment to respondent of the $4,400 in estimated payments during 1975 is not consistent with an intention to omit the bonus from the final 1975 return or to conceal the receipt of the bonus from respondent. Therefore, in spite of the slight reservations which we have with respect to the bonuses in 1972, we are satisfied that respondent has failed to establish that Mr. Poe with his limited education, lack o experience in bookkeeping, accounting and financial matters was aware of the omission of the bonus checks at the time the returns were filed or at the time he was interviewed by Mr. Quisenberry. Our findings as set forth above are further supported by the overall conduct of Mr. Poe as reflected by the record as a whole. For example, it is readily apparent and we have so found that the payments made to him by Dyer were made as Mr. Poe directed by checks issued in his name and not *476 in cash or in some other surreptitious manner. Respondent's agent readily admitted that he found no evidence during his investigation that any part of the funds represented by the Dyer checks had been used by Mr. Poe in any personal manner or for any purpose other than to entertain business associates of State Street, such as some of Dyer's employees (who controlled the time and manner in which State Street's cars appeared at the auction), and dealers who bid on the cars passing through the auction. The record contains other evidence of the same nature such as the fact that, with the exception of a $1,000 check, all of the bonuses from State Street were deposited in the names of petitioners in banks in their neighborhood, the fact that, during the interview with Mr. Quisenberry, petitioner readily answered seven pages of questions, including the location of bank accounts, the source of all deposits (receipts, both salary and bonuses from State Street), and the fact that the agent could examine or copy any and all records of petitioners. When considered as a whole, we find that the record in this case fails to indicate that petitioner's overall conduct was consistent with a fraudulent *477 purpose. Our opinion in this respect is not altered by the fact that on one or two occasions during the interview he failed to correctly answer general and very unspecific questions with respect to the Dyer checks and the State Street bonuses or that he exercised his constitutional right to consult an attorney when told that respondent had evidence "that he received substantial amounts of unreported income from one, and possibly more, auto auctions." In view of all of the foregoing, we conclude that respondent has failed to establish by clear and convincing evidence that any income was omitted from petitioners' returns through a fraudulent act or acts of Mr. Poe. Therefore, we are unable to sustain the additions to tax under section 6653(b) for any of the years 1971 through 1975. (3) Statute of Limitations
Petitioners filed timely income tax returns for each of the years 1971 through 1975. Respondent's notice of deficiency was mailed to petitioners on September 8, 1981. Consequently, the general three-year statute of limitations as provided by section 6501(a) had expired with respect to each year prior to the issuance of the notice. On brief petitioners have conceded *478 that the assessment for 1975 is not barred under section 6501(e). Respondent contends that the assessments for 1971 through 1974 are not barred under section 6501(c)(1) because the returns were fraudulent. However, in view of our finding with respect to fraud, section 6501(c)(1) is inapplicable and the assessments for 1971 through 1974 are barred. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
2. The additions to tax under section 6653(b) are determined solely against Kenneth Poe and not against Myrtle L. Poe. ↩
3. On brief petitioners conceded that 1975 is not barred under section 6501(e).↩
4. The record contains no specific explanation of the word "mistake" as used here by petitioner. However, from the testimony of both Mr. Poe and Mr. Katz, it is apparent that petitioner did not mean that the funds were taken by him through some error. By the use of the word he apparently meant that he should not have taken the checks without Mr. Katz's knowledge.↩
*. These amounts represent advances against expected bonuses.↩